Trenton R. Kashima (No. 291405)
**BRYSON HARRIS SUCIU**
**& DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Tel: (212) 946-9389
tkashima@brysonpllc.com

*Attorney for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **AMBER JENKINS**, on behalf of herself and all others similarly situated,<br>*Plaintiff,*<br>v.<br>**CETERA FINANCIAL GROUP, INC.**,<br>*Defendant.* | Case No. ________________<br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Amber Jenkins ("Plaintiff") brings this Class Action Complaint against Cetera Financial Group, Inc. ("Cetera" or "Defendant"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the sensitive personally identifiable information ("PII" or "Private Information") of Plaintiff and Class Members (defined below) that was compromised in a data breach involving unauthorized access to an employee email account (the "Data Breach").

2. Cetera Financial Group, Inc. is one of the largest independent financial services networks in the United States. Cetera supports approximately 12,000 financial advisors and over 450 financial institutions nationwide, managing roughly $640 billion in assets under administration.[1]

3. Defendant collected and maintained certain PII of Plaintiff and the putative Class Members, who provided their PII to Defendant, directly or indirectly, as a condition of receiving services from or accepting employment with Defendant.

4. Plaintiff's and Class Members' sensitive and confidential personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised, and unlawfully accessed due to the Data Breach.

5. Upon information and belief, the PII compromised in the Data Breach was targeted and accessed by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

6. Defendant became aware of suspicious activity involving a single employee email account and launched an investigation, which determined that an unauthorized person gained access to the email account between July 7, 2025, and

[1] Cetera Financial Group, About Us, https://cetera.com (last visited Apr. 15, 2026).

August 21, 2025—a period of approximately forty-five days.[2] On or around January 30, 2026, Defendant determined that certain PII was involved in the incident.[3] Defendant did not begin notifying affected individuals until March 25, 2026—approximately eight months after the unauthorized access began and nearly five months after Defendant discovered the PII was compromised.[4]

7. This was not Defendant's first data security failure. In August 2021, the United States Securities and Exchange Commission sanctioned five Cetera entities for failures in their cybersecurity policies and procedures that resulted in the takeover of over sixty employee email accounts between November 2017 and June 2020, exposing the PII of at least 4,388 customers and clients.[5] The SEC found that none of the compromised accounts had been protected with multi-factor authentication, despite Cetera's own policies requiring it.[6] Cetera was censured and ordered to pay a $300,000 penalty.[7]

8. Despite this prior regulatory enforcement—which put Cetera on express notice that its employee email security was deficient and that its systems were vulnerable to account takeover attacks—Defendant failed to implement adequate safeguards to prevent the substantially similar 2025 Data Breach at issue here.

9. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' and employees' PII from a foreseeable and preventable cyber-attack. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees,

---

[2] Cetera Financial Group, Data Breach Notice to N.H. Att'y Gen. (Mar. 24, 2026).
[3] Id.
[4] Id.
[5] *In re Cetera Advisor Networks LLC*, Exchange Act Release No. 34-92800, File No. 3-20490 (Aug. 30, 2021).
[6] Id. at 3.
[7] Press Release, U.S. Sec. & Exch. Comm'n, SEC Announces Three Actions Charging Deficient Cybersecurity Procedures, Release No. 2021-169 (Aug. 30, 2021).

requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity, and regularly rotating passwords.

10. Moreover, upon information and belief, Defendant was targeted for a cyber-attack due to its status as a financial services company that collects and maintains highly valuable PII—including Social Security numbers, financial account information, and payment card data—on its systems.

11. Defendant disregarded the rights of Plaintiff and Class Members by, inter alia, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

12. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft and will incur out-of-pocket costs for purchasing credit monitoring services, credit freezes, credit reports, and other protective measures.

13. Plaintiff brings this class action lawsuit on behalf of all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to unauthorized access.

14. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## PARTIES

15. Plaintiff Amber Jenkins is a natural person and citizen of the State of Illinois, residing in Wood River, Illinois.

16. Defendant Cetera Financial Group, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2301 Rosecrans Avenue, Suite 5100, El Segundo, California 90245. Defendant conducts business throughout the United States, including in this District.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from Defendant.

18. This Court has personal jurisdiction over Defendant because Defendant's principal office is located in this District through its business operations in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant's principal place of business is located in this District and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

***Defendant's Business***

20. Cetera Financial Group, Inc. is an independent financial services provider and wealth management network in the United States, supporting over 12,000 financial advisors and managing over $640 billion in assets.

21. Cetera operates a network of wholly-owned subsidiary broker-dealers and registered investment advisers, all of which are members of FINRA/SIPC or

registered with the SEC. Cetera Financial Group, Inc., as corporate parent, provides centralized business services to its subsidiary entities, including cybersecurity. (See In re Cetera Advisor Networks LLC, Exchange Act Release No. 34-92800 at 2.)

22. In the course of their relationship, Plaintiff and Class Members provided Defendant with their sensitive Private Information, including names, Social Security numbers, dates of birth, driver's license numbers, financial account numbers, and payment card information.

23. Upon information and belief, in the course of collecting PII from Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate security for the data it collected from individuals through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

24. Plaintiff and the Class Members relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

25. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendant absent a promise to safeguard that information.

***The Data Breach***

26. Defendant became aware of suspicious activity involving a single employee email account and immediately began an investigation.[8]

27. Defendant's investigation determined that an unauthorized person gained access to the employee email account between July 7, 2025, and August 21, 2025.[9] Defendant then took steps to identify any impacted data.[10]

---

[8] Cetera Financial Group, supra note 2.
[9] Id.
[10] Id.

28. On or around January 30, 2026, Defendant's ongoing review determined that certain Private Information may have been compromised.[11] Upon information and belief, the following types of Private Information were compromised: name, Social Security number, date of birth, driver's license number, financial account information, and payment card information.

29. Cetera did not begin notifying affected individuals until approximately March 25, 2026. Thus, approximately eight months elapsed between when the unauthorized access began and when affected individuals received notice, and approximately five months elapsed between when Cetera confirmed PII was involved and when notice was sent.

30. Upon information and belief, the total number of individuals affected by the Data Breach has not been publicly disclosed. However, given that Cetera supports approximately 12,000 financial advisors and over 450 financial institutions nationwide, the number of potentially affected individuals is substantial. Cetera reported at least 110 affected New Hampshire residents to the New Hampshire Attorney General alone.[12]

31. Defendant had obligations created by the GLBA, the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

32. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, including failing to encrypt the information or delete it when no longer needed.

33. Moreover, Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access

[11] Id.
[12] Cetera Financial Group, supra note 2.

credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

34. As a result of Defendant's failures, the attacker targeted, accessed, and acquired files containing unencrypted PII of Plaintiff and Class Members.

***Defendant's History of Cybersecurity Failures***

35. The 2025 Data Breach was not Defendant's first email-based security incident. Between November 2017 and June 2020, cloud-based email accounts of over sixty Cetera personnel were taken over by unauthorized third parties, resulting in the exposure of PII of at least 4,388 customers and clients.[13]

36. On August 30, 2021, the SEC sanctioned five Cetera entities—Cetera Advisor Networks LLC, Cetera Investment Services LLC, Cetera Financial Specialists LLC, Cetera Advisors LLC, and Cetera Investment Advisers LLC—for failures in their cybersecurity policies and procedures.[14] The SEC's order found that the Cetera Entities violated Rule 30(a) of Regulation S-P, also known as the Safeguards Rule, which is designed to protect confidential customer information.[15]

37. The SEC found that Cetera's policies and procedures to protect customer information and to prevent and respond to cybersecurity incidents were not reasonably designed to meet their objectives.[16] Critically, none of the compromised email accounts had multi-factor authentication enabled, even though Cetera's own internal policies had required MFA "wherever possible" since 2018.[17]

38. The SEC further found that Cetera Advisors LLC and Cetera Investment Advisers LLC sent misleading breach notification letters to clients that

[13] *In re Cetera Advisor Networks LLC*, supra note 5.
[14] Id.
[15] Id. at 2.
[16] Id. at 3–4.
[17] Id. at 3.

included language suggesting the notifications were issued much sooner than they actually were after discovery of the incidents.[18]

39. Cetera was censured and ordered to pay a $300,000 civil penalty.[19] The 2021 SEC enforcement action put Defendant on express regulatory notice that: (a) its employee email accounts were vulnerable to takeover attacks; (b) its cybersecurity policies and procedures were inadequate; (c) its MFA implementation was deficient; and (d) its breach notification practices were misleading.

40. Despite this prior enforcement and express notice, the 2025 Data Breach involved the same type of compromise—unauthorized access to an employee email account—demonstrating that Defendant failed to remediate the known deficiencies identified by the SEC.

***Defendant's Security Obligations***

41. As a financial services company whose subsidiaries are registered broker-dealers and investment advisers, Cetera and its subsidiaries are subject to the Gramm-Leach-Bliley Act ("GLBA"), which requires financial institutions to establish appropriate standards to protect the security and confidentiality of customer records and information, to protect against anticipated threats, and to protect against unauthorized access that could result in substantial harm or inconvenience to any customer.[20]

42. The FTC Safeguards Rule, 16 C.F.R. Part 314, implements the GLBA's information security requirements for non-bank financial institutions. The Safeguards Rule requires covered financial institutions to develop, implement, and maintain a comprehensive information security program with specified administrative, technical, and physical safeguards, including access controls,

[18] Id.
[19] Press Release, U.S. Sec. & Exch. Comm'n, supra note 7.
[20] 15 U.S.C. § 6801(b) (2018).

encryption of customer information, multi-factor authentication, and continuous monitoring.[21]

43. In addition, Regulation S-P, 17 C.F.R. § 248.30(a), independently requires every broker-dealer and investment adviser registered with the SEC to adopt written policies and procedures reasonably designed to safeguard customer records and information. The SEC has already found Cetera in violation of this regulation.[22]

44. Defendant also had obligations to protect PII under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC has long interpreted failures to implement reasonable data security as unfair practices under Section 5.[23] The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures as an unfair act or practice. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

45. The FTC has issued extensive guidance on data security for businesses. The FTC's Start with Security guide distills lessons from over fifty enforcement actions and establishes that reasonable security includes access controls, strong authentication, network monitoring, secure remote access, timely patching, and secure development practices.[24] The FTC's Protecting Personal Information guide further establishes that reasonable security includes inventorying stored PII, securely disposing of unneeded data, encrypting sensitive information, understanding system vulnerabilities, and planning for breaches.[25] The FTC's Data Breach Response guide establishes that upon learning of a breach, organizations must promptly secure

---

[21] 16 C.F.R. §§ 314.3, 314.4 (2024).

[22] *In re Cetera Advisor Networks LLC*, supra note 5, at 2.

[23] Fed. Trade Comm'n, Data Security, https://www.ftc.gov/business-guidance/privacy-security/data-security (last visited Apr. 15, 2026).

[24] Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015).

[25] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016).

systems, remediate vulnerabilities, preserve evidence, assemble a response team, and provide required notifications.[26]

46. Industry standards and authoritative frameworks further establish the standard of care. NIST Special Publication 800-53 Rev. 5 provides a comprehensive catalog of security and privacy controls.[27] NIST Special Publication 800-61 Rev. 3 establishes current best practices for incident response.[28] The CIS Critical Security Controls v8.1 provides prioritized, actionable safeguards representing consensus industry best practices for reasonable security.[29]

47. Upon information and belief, Defendant failed to comply with one or more of these frameworks. Defendant's history of cybersecurity failures — including the SEC's 2021 finding that Cetera's policies and procedures were not reasonably designed to protect customer information — together with the substantially similar nature of the 2025 Data Breach, supports that Defendant continued to maintain inadequate security controls, resulting in data thieves acquiring and accessing the PII of Plaintiff and Class Members.

***Data Breaches Are Preventable***

48. Data breaches, particularly those originating from employee email compromises, are preventable when organizations implement and enforce reasonable security measures. Email-based account takeover attacks are among the most well-understood and well-documented threats in the cybersecurity landscape.

49. Defendant could have prevented this Data Breach by, among other things: (a) enforcing multi-factor authentication on all employee email accounts, which Cetera's own policies had required since 2018 but which the SEC found Cetera had failed to implement; (b) properly encrypting PII stored in or accessible

[26] Fed. Trade Comm'n, Data Breach Response: A Guide for Business (Aug. 2023).
[27] Joint Task Force, Nat'l Inst. of Standards & Tech., NIST Special Publication 800-53, Rev. 5, Security and Privacy Controls for Information Systems and Organizations (Sept. 2020).
[28] Nat'l Inst. of Standards & Tech., NIST Special Publication 800-61, Rev. 3, Incident Response Recommendations and Considerations for Cybersecurity Risk Management (Apr. 2025).
[29] Ctr. for Internet Sec., CIS Critical Security Controls v8.1 (2024).

through email accounts; (c) implementing email filtering and anti-phishing controls; (d) limiting access to sensitive PII on a need-to-know basis; (e) monitoring for suspicious login activity, including logins from unfamiliar locations or devices; (f) configuring alerts for unusual data access patterns; (g) training employees on phishing awareness and social engineering; and (h) implementing data loss prevention tools to detect and prevent the exfiltration of sensitive information.

50. CISA has repeatedly warned organizations about the threat of email-based attacks and has published detailed guidance on prevention and response, including the #StopRansomware Guide.[30]

51. Given that Defendant was storing a substantial amount of sensitive Private Information—including Social Security numbers, financial account information, and payment card data—and had already been sanctioned by the SEC for the same type of security failure, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks. The occurrence of the Data Breach indicates that Defendant failed to do so.

***Defendant Knew or Should Have Known of the Risk***

52. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and data breaches targeting financial services companies preceding the date of the breach.

53. According to the Identity Theft Resource Center's 2025 Data Breach Report, the financial services sector continued to experience a significant volume of data compromises.[31] The 2024 Annual Data Breach Report similarly documented elevated breach volumes in the period immediately preceding the Data Breach.[32]

54. Most importantly, Defendant's own history made this Data Breach uniquely foreseeable. The SEC's 2021 enforcement action found that Cetera had

[30] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (Sept. 2020, updated Mar. 2025).

[31] Identity Theft Res. Ctr., 2025 Data Breach Report (20th ed. Jan. 2026).

[32] Identity Theft Res. Ctr., 2024 Annual Data Breach Report (Jan. 28, 2025).

suffered employee email account takeovers for over three years, and that Cetera's cybersecurity policies were inadequate.[33] That prior enforcement put Defendant on actual notice that employee email accounts were a known attack vector and that its defenses were insufficient.

55. Despite this notice, the 2025 Data Breach involved the same type of attack exploiting the same type of vulnerability. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's regulatory history and the known high frequency of cyberattacks in the financial industry.

56. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

***Value of Personally Identifying Information***

57. The PII compromised in the Data Breach—including Social Security numbers, dates of birth, driver's license numbers, and financial account information—is among the most sensitive categories of personal information and is highly valuable to criminals.

58. Social Security numbers are particularly dangerous because they are immutable identifiers that can be used to commit a wide range of fraud, including tax fraud, benefits fraud, employment fraud, financial fraud, and unauthorized account openings. According to the Social Security Administration, each time an individual's Social Security number is compromised, the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories, and other private information increases.[34]

---

[33] *In re Cetera Advisor Networks LLC*, supra note 5.
[34] Soc. Sec. Admin., Identity Theft and Your Social Security Number (2018).

59. A stolen Social Security number is one of the leading causes of identity theft and can threaten an individual's financial health. Someone who has an individual's SSN can use it to impersonate the victim, obtain credit and open bank accounts, apply for jobs, steal tax refunds, obtain medical treatment, and steal government benefits.

60. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as credit bureaus and banks are able to link the new number very quickly to the old number.

62. The fraudulent activity resulting from the Data Breach may not come to light for years. According to the Government Accountability Office, stolen data may be held for a year or more before being used to commit identity theft, and once stolen data has been sold or posted online, fraudulent use may continue for years.[35] The FTC has similarly noted that identity thieves do not always use stolen information immediately.[36]

63. Because Social Security numbers cannot be easily changed—and because financial institutions continue to use them as primary identifiers—the exposure of this category of PII creates a permanent, ongoing risk of identity theft and fraud that cannot be fully mitigated.

64. The information compromised in this Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because victims can cancel or close credit and debit card accounts. The information compromised here—Social Security numbers, dates of birth, financial

[35] U.S. Gov't Accountability Off., GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (2007).

[36] Ari Lazarus, How Fast Will Identity Thieves Use Stolen Info?, Fed. Trade Comm'n (May 24, 2017).

account information—is impossible to "close" and difficult, if not impossible, to change.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

65. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified that their PII was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

66. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, reviewing credit reports and financial account statements, placing fraud alerts and credit freezes, disputing unauthorized charges, and monitoring for signs of misuse. The Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

67. Plaintiff's mitigation efforts are consistent with the GAO's finding that victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.[37]

68. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends that data breach victims take, including contacting credit bureaus to place fraud alerts, reviewing credit reports, contacting companies to remove fraudulent charges, placing credit freezes, and correcting credit reports.[38]

---

[37] U.S. Gov't Accountability Off., supra note 35, at 29.

[38] Fed. Trade Comm'n, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Apr. 15, 2026).

***Loss of Benefit of the Bargain***

69. Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to receive services from Defendant or accept employment with Defendant, Plaintiff and other reasonable consumers and employees understood and expected that they were, in part, paying for—or receiving less compensation in exchange for—necessary data security to protect the PII they were required to provide. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive.

***Future Cost of Credit and Identity Theft Monitoring***

70. Given the type of PII involved—Social Security numbers, financial account information, and payment card data—there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market or dark web for sale to criminals intending to utilize the PII for identity theft crimes, including opening bank accounts in the victims' names, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

71. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

72. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. The cost of credit monitoring and identity theft monitoring necessary to protect against this risk is reasonable and necessary.

**PLAINTIFF-SPECIFIC ALLEGATIONS**

73. Plaintiff provided her PII to Defendant in the course of accepting employment with Defendant. Plaintiff was employed by Cetera from approximately October 2024 to approximately October 2025.

74. Plaintiff was required to provide her PII to Defendant, including her name, date of birth, Social Security number, and payment card information.

75. Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff's PII in its system.

76. Plaintiff is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's inadequate data security policies.

77. In January or February 2026—before Plaintiff even received notice of the Data Breach—Plaintiff experienced unauthorized fraudulent charges on her debit card associated with her bank account. Plaintiff was required to take numerous steps to secure her bank account, including contacting Chime, disputing the fraudulent charges, and monitoring her account for further unauthorized activity. These efforts required significant time and effort.

78. Upon information and belief, the unauthorized charges on Plaintiff's account were caused by the compromise of her PII in the Data Breach. The timeline supports this inference: the unauthorized access to Defendant's employee email account occurred between July and August 2025; Plaintiff's PII — including her name, date of birth, Social Security number, and payment card information — was stored in or accessible through that compromised account; and the unauthorized charges occurred within months thereafter, before Defendant had even notified affected individuals. Plaintiff had not experienced similar unauthorized activity prior to the Data Breach.

79. As a result of the Data Breach, Plaintiff made reasonable efforts to respond to and mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, reviewing her credit report and financial accounts for instances of misuse, and securing her bank account. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities. This time has been lost forever and cannot be recaptured.

80. Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) unauthorized fraudulent charges on her debit card; (b) invasion of privacy; (c) theft of her PII; (d) lost or diminished value of PII; (e) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (f) loss of benefit of the bargain; (g) the continued and certainly increased risk to her PII, which remains unencrypted and available for unauthorized third parties to access and abuse and remains backed up in Defendant's possession subject to further unauthorized disclosures; (h) anxiety, stress, and fear regarding the security of her personal and financial information; and (i) the need for ongoing monitoring of her financial accounts and credit reports.

81. Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## INJURIES COMMON TO THE CLASS

82. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have sustained injuries and damages, including:

a) invasion of privacy;

b) theft of their PII;

c) lost or diminished value of PII;

d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

e) loss of benefit of the bargain;

f) out-of-pocket costs incurred and to be incurred to mitigate the risk of identity theft, including credit monitoring, credit freezes, and other protective measures;

g) the continued and certainly increased risk to their PII, which (1) remains unencrypted and available for unauthorized third parties to access and abuse, and (2) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII; and

h) nominal damages.

83. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

84. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long-lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

85. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

## CLASS ACTION ALLEGATIONS

86. Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4), and/or 23(c)(5).

87. The Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the Data Breach.

88. Excluded from the Class are: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

89. Plaintiff reserves the right to amend the Class definition or to add a Class or Subclass if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

90. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Upon information and belief, the Class is comprised of thousands of members. The Class is apparently identifiable within Defendant's records.

91. Commonality and Predominance. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the common questions are:

a) Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b) Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c) Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

d) Whether and when Defendant actually learned of the Data Breach;

e) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

f) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g) Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h) Whether Plaintiff and Class Members are entitled to actual damages, consequential damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

i) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

92. Typicality. Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

93. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole.

94. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff

has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

95. Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members who could not individually afford to litigate a complex claim against large corporations, like Defendant.

96. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

97. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

98. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
(On Behalf of Plaintiff and the Nationwide Class)

99. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100. Defendant requires individuals to submit non-public PII in the ordinary course of rendering services and employing personnel.

101. Defendant gathered and stored the PII of Plaintiff and Class Members as part of its regular course of business operations.

102. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

103. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

104. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer systems—and Class Members' PII held within them—to prevent disclosure, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

105. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

106. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with the GLBA, the FTC Safeguards Rule, Regulation S-P, NIST frameworks, CIS Controls, CISA guidance, and other industry standards discussed herein, and to ensure that its systems and networks adequately protected the PII.

107. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of being customers and employees.

108. Defendant was subject to an independent duty, untethered to any contract between Defendant and Plaintiff or the Class.

109. Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' and employees' PII it was no longer required to retain.

110. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach. Defendant had and continues to have a duty to adequately disclose that the PII within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and fraudulent use of their PII by third parties.

111. Defendant breached its duties, pursuant to the FTC Act, the GLBA, Regulation S-P, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a) Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b) Failing to implement or enforce multi-factor authentication for employee email accounts, despite having been sanctioned by the SEC for the same deficiency in 2021;

c) Failing to adequately monitor the security of its networks and systems;

d) Failing to encrypt PII stored in or accessible through employee email accounts;

e) Allowing unauthorized access to Class Members' PII for approximately forty-five days;

f) Failing to detect in a timely manner that Class Members' PII had been compromised;

g) Failing to adequately train employees on data security and phishing awareness;

h) Failing to remove former customers' and employees' PII it was no longer required to retain; and

i) Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

112. Plaintiff and Class Members were within the class of persons the FTC Act, GLBA, and Safeguards Rule were intended to protect, and the type of harm that resulted from the Data Breach was the type of harm that those statutes were intended to guard against.

113. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's prior SEC enforcement history, its inadequate security practices, and the known high frequency of cyberattacks targeting financial services companies.

114. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

115. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class,

the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

116. Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

117. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

118. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

119. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

120. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (a) unauthorized fraudulent charges; (b) invasion of privacy; (c) theft of their PII; (d) lost or diminished value of PII; (e) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (f) loss of benefit of the bargain; (g) the continued and certainly increased risk to their PII; and (h) nominal damages.

121. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

122. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

123. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
(On Behalf of Plaintiff and the Nationwide Class)

124. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

125. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for Defendant's services or as a condition of employment, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

126. Defendant solicited, offered, and invited Class Members to provide their Personal Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

127. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including the GLBA and Safeguards Rule, and adhered to industry standards.

128. Plaintiff and Class Members received wages from Defendant or paid money to Defendant or had money paid to Defendant on their behalf with the reasonable belief and expectation that Defendant would use part of those resources to obtain adequate data security. Defendant failed to do so.

129. Plaintiff and Class Members would not have entrusted their Personal Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

130. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

131. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

132. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information, including by: (a) failing to implement and maintain reasonable security measures to protect their PII; (b) failing to implement or enforce multi-factor authentication despite having been sanctioned by the SEC for this deficiency; (c) permitting unauthorized access to their PII for approximately forty-five days; and (d) failing to provide timely and accurate notice of the Data Breach.

133. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages, including the loss of the benefit of the bargain, the diminished value of the services they received, the exposure of their PII to unauthorized third parties, the substantial and ongoing risk of identity theft and fraud, out-of-pocket costs incurred to mitigate that risk, and the present value of ongoing credit monitoring necessitated by the Data Breach.

134. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

135. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring

procedures; and (c) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
(On Behalf of Plaintiff and the Class, In the Alternative)

136. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

137. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with payments or had wages withheld, directly or indirectly, in exchange for services or employment. In exchange, Plaintiff and Class Members should have had their PII protected with adequate data security.

138. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting the payments or withholding wages and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' PII and used it for business purposes.

139. Defendant was supposed to use some of the monetary benefits provided to it by Plaintiff and Class Members to secure the PII belonging to Plaintiff and Class Members by paying for costs of adequate data management and security.

140. Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value of their payments or wages, or the PII they provided.

141. Defendant acquired the PII through inequitable means as it failed to disclose its inadequate data security practices.

142. If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendant or obtained services from Defendant.

143. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead utilized cheaper, ineffective security measures and diverted those funds to its own profit. Plaintiff and Class Members suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

144. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

145. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

146. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and Class Members, respectfully requests that this Court enter judgment against Defendant and grant the following relief:

A. For an Order certifying the Class, and appointing Plaintiff and her counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C. For injunctive relief requiring Defendant to implement and maintain a comprehensive information security program, including but not limited to: (i)

mandatory multi-factor authentication for all employee accounts; (ii) encryption of PII at rest and in transit; (iii) regular security audits by independent third-party assessors; (iv) employee training programs on cybersecurity and phishing awareness; (v) data minimization practices to delete, destroy, and purge PII no longer needed; (vi) monitoring and logging programs sufficient to detect unauthorized access; (vii) network segmentation to prevent lateral movement; and (viii) for a period of ten years, annual SOC 2 Type 2 attestation by a qualified independent third-party assessor to evaluate Defendant's compliance;

D. For a declaration pursuant to 28 U.S.C. § 2201 that Defendant's existing security measures are inadequate and that Defendant owes ongoing duties of reasonable security, timely notification, and mitigation to Plaintiff and Class Members;

E. For an award of actual, compensatory, consequential, and nominal damages in an amount to be determined at trial;

F. For restitution and disgorgement of Defendant's ill-gotten gains;

G. For an award of attorneys' fees, costs, and expenses of litigation;

H. For prejudgment interest on all amounts awarded; and

I. For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED: April 16, 2026

*/s/Trenton R. Kashima*
Trenton R. Kashima (No. 291405)
**BRYSON HARRIS SUCIU & DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Tel: 212-946-9389
tkashima@brysonpllc.com

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com

**Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Proposed Class*